```
THIS OPINION IS
A PRECEDENT OF
THE TTAB
```

Mailed: December 12, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Spirits of New Merced, LLC
_____

Serial No. 78710805
_____

Kenneth A. Vogel of Bar-Adon & Vogel, PLLC for Spirits of New Merced, LLC.

Lydia M. Belzer, Trademark Examining Attorney, Law Office 108 (Andrew Lawrence, Managing Attorney).
_____

Before Hohein, Holtzman and Bergsman, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

Spirits of New Merced, LLC (applicant) has filed an application to register the mark YOSEMITE BEER (in standard character form) for goods ultimately identified as "alcoholic beer" in Class 32.[1]  The word BEER is disclaimed.

_____

[1] Serial No. 78710805, filed September 12, 2005, based on an allegation of a bona fide intention to use the mark in commerce.  Applicant filed an amendment to allege use on November 22, 2005, ultimately asserting that the mark was first used on November 11, 2005 and first used in commerce on November 22, 2005.  The application was amended, at applicant's request, to state that:  "The foreign wording in the mark

The trademark examining attorney has refused registration under Section 2(e)(2) of the Trademark Act on the ground that applicant's mark YOSEMITE BEER, as applied to beer, is primarily geographically descriptive of the goods.

When the refusal was made final, applicant appealed. Briefs have been filed.

In order for a mark to be considered primarily geographically descriptive under Section 2(e)(2), it must be shown that (1) the mark's primary significance is a generally known geographic location; and (2) that the relevant public would be likely to make a goods/place association, that is, would be likely to believe that the goods originate in the place named in the mark. See In re Save Venice New York, Inc., 259 F.3d 1346, 59 USPQ2d 1778 (Fed. Cir. 2001); In re Nantucket, 677 F.2d 95, 213 USPQ 889 (CCPA 1982); In re Brouwerij Nacional Balashi NV, 80 USPQ2d 1820 (TTAB 2006); In re JT Tobacconists, 59 USPQ2d 1080 (TTAB 2001); and In re California Pizza Kitchen, Inc., 10 USPQ2d 1704 (TTAB 1988). Provided that these conditions are met and the goods come from the place named by or in the mark, the mark is primarily geographically descriptive.

The record shows that applicant's beer is produced and sold in applicant's brewpub, a restaurant that brews and serves its

_____

translates into English as 'Those Who Kill' in the Miwok Indian tribe language."

2

own beer, and that the brewpub is located in the city of Merced, California, which is approximately 80 miles from Yosemite National Park. The examining attorney argues that "Yosemite" is a generally known place. She further argues, based on applicant's statements and evidence in support of registration, that applicant's beer originates "in the Yosemite region," and that there is a goods/place association between applicant's beer and Yosemite in view of the connection between Yosemite and the city of Merced.

Applicant essentially argues that YOSEMITE BEER is not primarily geographically descriptive of applicant's beer, contending that there is no such place as "Yosemite"; that its beer does not originate in Yosemite National Park; and that there is no connection between beer and Yosemite National Park.

We affirm the refusal for the reasons discussed below.

## Primary Significance

As to the first part of the test, a mark is not "primarily" geographic where the geographic meaning is minor, obscure, remote, or unconnected with the goods. In re Wada, 194 F.3d 1297, 52 USPQ2d 1539, 1540 (Fed. Cir. 1999); In re Loew's Theatres, Inc., 769 F.2d 764, 226 USPQ 865, 867 (Fed. Cir. 1985) (use of a geographic term in a fictitious, arbitrary or fanciful manner, is not "primarily" as a geographic designation); and In re Brouwerij Nacional Balashi NV, supra at 1824.

Thus, registration should not be refused where, for example, the place named in the mark is so obscure or remote that purchasers would fail to recognize the term as indicating the geographical source of the goods to which the mark is applied; or an admittedly well-recognized term has other meanings, such that the term's geographical significance may not be the primary significance to prospective purchasers. See In re Cambridge Digital Systems, 1 USPQ2d 1659 (TTAB 1986).

The examining attorney argues that the record as a whole, including applicant's evidence, indicates that Yosemite National Park is a well known region; that "Yosemite" is a commonly used nickname or shorthand for Yosemite National Park; and that the primary significance of the term "Yosemite" is geographic because of the size and popularity of Yosemite National Park.

While not disputing that Yosemite National Park is a well-known geographic region, applicant argues that "there is no place on earth named Yosemite or Yosemite, California" (Brief, p. 6), noting that the U.S. Postal Service does not recognize "Yosemite, CA" as an acceptable mailing address. Applicant maintains that such word "standing alone does not hold any independent significance, geographic or otherwise." (Brief, p. 5.)

There is no real dispute, and the evidence submitted by applicant and the examining attorney shows, that Yosemite National Park is the name of a well-known, if not famous,

4

geographic region that is clearly not obscure or remote.  The park is located in the Sierra Nevada mountain range in central California (yosemitepark.com and nps.gov); and it was designated a national park in 1890 and a World Heritage Site in 1984. (nps.org and wikipedia.org.[2])  Because of the park's "spectacular and awe-inspiring" setting, it is referred to as "The Crown Jewel" of the National Park system.  (Yosemitepark.org.)  As noted on the wikipedia.org website, "Yosemite is internationally recognized for its spectacular granite cliffs, waterfalls, clear streams, Giant Sequoia groves, and biological diversity" and that "Yosemite is famous for its high concentration of waterfalls in such a limited area."  The evidence shows that the "famed Yosemite Valley" is enclosed within the park, as are the "world's three largest monoliths of exposed granite" and the highest waterfall in North America.  The Columbia Gazetteer of North America (2000).  The park covers 1,189 square miles, about the size of Rhode Island, (id.) and it receives over 3 million visitors each year.  (wikipedia.org.)

It can also be seen from some of the references above, and the evidence as follows, that the term "Yosemite" is a well recognized and frequently used shorthand reference to

---

[2] There is no issue as to the accuracy of the Wikipedia information relied on by the examining attorney, and so we have considered this evidence.  See In re IP Carrier Consulting Group, 84 USPQ2d 1028, 1032 (TTAB 2007).

Serial No. 78710805

Yosemite National Park and the Yosemite region in general. For example, The Hutchinson Unabridged Encyclopedia (2005) contains an entry for "Yosemite" describing it as a "Region in the Sierra Nevada, eastern California."[3] On the "National Park Service" website (nps.org) "Yosemite" is displayed in large lettering at the top of the page while "National Park" is in very small letters at the bottom; and the site also includes a link for "Yosemite In Depth." Additional references to "Yosemite" are shown below:

> ... This site is managed by Yosemite's primary concessionaire, Delaware North Companies Parks & Resorts at Yosemite, Inc. ...
> [The site also contains a quote from Ralph Waldo Emerson]: "In Yosemite, the grandeur of these mountains is perhaps unmatched in the globe ..."
> (yosemitepark.com)
>
> Yosemite Online
> The website of the Yosemite Association
> ...
> Six Ways to Help Us Help Yosemite
> ...
> Yosemite Web Cam
> (yosemite.org)
>
> MERCED, CA: Ride YARTS and See Yosemite Differently
> Welcome to the YOSEMITE AREA REGIONAL TRANSPORTATION SYSTEM web page!
> This site features information on all aspects of riding on YARTS ...seeing more of Yosemite than one can see from behind the wheel.
> (yarts.com)

---

[3] From the website credoreference.com. The Board may take judicial notice of reference works, including online reference works, which exist in printed format. See In re CyberFinancial.Net Inc., 65 USPQ2d 1789, 1791 n.3 (TTAB 2002).

> The Greater Merced Chamber of Commerce
> GATEWAY TO YOSEMITE
> Yosemite National Park attracted almost four million
> visitors into their gate last year.
> (Brochure of The Greater Merced Chamber of Commerce)[4]

It is well settled that a recognized nickname or other informal name for a geographic location is considered the equivalent of the official or formal name for purposes of determining registrability of the geographic term. See In re Carolina Apparel, 48 USPQ2d 1542 (TTAB 1998) (the term CAROLINA, used to indicate either North Carolina or South Carolina, is geographically descriptive); and In re Charles S. Loeb Pipes, Inc., 190 USPQ 238, 246 (TTAB 1975) (OLD DOMINION is an accepted nickname for the State of Virginia; "nicknames and even abbreviations and maps of geographical areas and the names of the geographical area that they identify are, for purposes of registration, identical, and ... the same criteria for registration must necessarily apply thereto").[5]

In addition, the examining attorney has made of record ten third-party registrations consisting of or including the term YOSEMITE, each of which issued either on the Supplemental Register, or on the Principal Register under Section 2(f) or with

---

[4] See the discussion regarding the Merced Chamber of Commerce brochure *infra*.

[5] We note that although the Court in In re Nantucket, supra, was critical of the Board in the *Loeb* case for not considering whether there was a goods/place association, there was no criticism of the Board's analysis of whether a nickname could be a geographic term.

a disclaimer of YOSEMITE, indicating that YOSEMITE has been regarded by the Office as a geographic term.  In fact, several of these registrations (for example, Registration Nos. 1882576 and 2741174) are issued to entities having an address of "Yosemite, California."  This tends to undercut applicant's claim that there "is no place on earth" named "Yosemite, California."

We find that the term "Yosemite," alone, conveys a readily recognizable geographic significance.  We further find no genuine issue that the primary significance of "Yosemite" is a geographic place which is not obscure or remote but rather is generally known to the public.  Applicant's evidence and arguments fail to raise any genuine issue regarding the primary significance of the term.

Applicant argues that the primary significance of "Yosemite" is not geographic because, when used by itself, the term has another meaning.  Pointing to the website, yosemite.ca.us, which explains the origin of the term "Yosemite," applicant states that the word means "those who kill," or "the killers" in the Native American Miwok tribal language and, as noted earlier, applicant has amended the application to include a translation of this "foreign wording" in the mark.

We are not persuaded by this argument.  There is no evidence that the general public would be familiar with the derivation of "Yosemite" or that this meaning would be anything but obscure to

8

them.  Even if consumers were aware of this meaning, it would not detract from the primary meaning of "Yosemite" as denoting a well-known geographic region.  See, e.g., In re Juleigh Jeans Sportswear Inc., 24 USPQ2d 1694, 1697 (TTAB 1992) (while "London" also has surname significance, the primary connotation of the term is geographical); and In re The Cookie Kitchen, Inc., 228 USPQ 873, 874 (TTAB 1986) (the fact that "Manhattan" is also the name of a cocktail does not rebut the prima facie showing that the primary meaning is geographic).

Applicant also argues that its mark YOSEMITE BEER relates to the decorative "cowboy-western" theme of its restaurant and menu items, and that it "does not purport any relationship to Yosemite National Park."  (Brief, p. 4.)  There is no evidence properly of record to support this contention,[6] but more important, any such theme of applicant's restaurant, to the extent one exists, is irrelevant because applicant is seeking registration for beer, not for restaurant services or for beer brewed on the premises of a restaurant.  Also, cf., as to themes of services, In re Consolidated Specialty Restaurants Inc., 71 USPQ2d 1921, 1929 (TTAB 2004) (COLORADO STEAKHOUSE and design for restaurant services held primarily geographically deceptively misdescriptive

---

[6] The examining attorney has objected to the menu and photographs from applicant's brewpub which were submitted by applicant for the first time with its appeal brief.  The objection is well taken.  This evidence is untimely and it has not been considered.  See Trademark Rule 2.142(d).

of restaurant services; "To the extent the copies of menus and wall art from applicant's steakhouses relate specifically to Colorado, they serve to strengthen the association of applicant's restaurants/steakhouses with Colorado"); and In re Ruffin Gaming, LLC, 66 USPQ2d 1924 (TTAB 2002) [FISHERMAN'S WHARF held merely descriptive of the theme of applicant's entertainment services which include hotel services, restaurant services, nightclub services, café services and providing convention facilities).

In addition, applicant argues that the term "Yosemite" is registered on the Principal Register by other entities without resort to Section 2(f). In support of this, applicant has submitted printouts of 23 third-party registrations and a number of third-party applications for a variety of goods and services, including outdoor activities and goods used in connection with such activities. Based on this evidence, applicant concludes that "Yosemite" "now connotes all manner of nature, sports and outdoor activities" (Brief, p. 10.) and that its mark YOSEMITE BEER is used in the same non-geographically descriptive or non-geographically deceptively misdescriptive manner as the marks in these third-party registrations and applications.

Applicant points, in particular, to two now-cancelled registrations for YOSEMITE BEER and YOSEMITE BREWING COMPANY,

both for beer, which were issued to another entity.[7] Noting that this entity was located in Mariposa, California which, as shown by the map and the Gazetteer entry submitted by applicant, is about 40 miles from the park, applicant argues that these marks were allowed to register notwithstanding that this location "is even closer to the Park than Applicant's brewpub" in Merced. (Brief, pp. 8, 9.)

None of this evidence serves to establish that the primary meaning of YOSEMITE is not geographical. To begin with, the third-party applications and cancelled registrations, which together constitute a significant portion of the records submitted by applicant, have no probative value on the issue of registrability. They are evidence only of the fact that the application or registration was filed on a certain date. In addition, we are not bound by a previous examining attorney's determination that the same mark was entitled to register, and to the extent that registration was issued in error, we would not repeat the error by permitting the mark to register again.[8] See

---

[7] The registrations were issued to Yosemite Beverage Co. Registration No. 2131642 (YOSEMITE BEER) was cancelled on July 10, 2004 and Registration No. 2234545 (YOSEMITE BREWING COMPANY) was cancelled on October 30, 2004. Both registrations were cancelled for failure to file a Section 8 affidavit.

[8] To the extent that applicant is arguing that the examining attorney is estopped from denying registration to applicant in view of this prior registration for the same mark, we point out that applicant was not the owner of that registration, and moreover, a cancelled registration is not entitled to any of the statutory presumptions of

In re Cooper, 254 F.2d 611, 117 USPQ 396, 401 (CCPA 1958) ("...the decision of this case in accordance with sound law is not governed by possibly erroneous past decisions by the Patent Office"). See also In re Stenographic Machines, Inc., 199 USPQ 313, 317 (Comm'r Pats. 1978) ("Consistency of Office practice must be secondary to correctness of Office practice.").

Nor do the remaining 15 active third-party registrations compel a finding that the present mark is registrable. At the outset, we note that of the group of active registrations, one is registered on the Supplemental Register (Registration No. 2652898) and in another (Registration No. 2370876) the term YOSEMITE is disclaimed. In addition, some of the registrations are for marks that create different commercial impressions (e.g., Registration No. 2944781 for the mark YOSEMITE GOLD for "fresh citrus fruit and living citrus trees"); or for goods or services that are far removed from beer (e.g., Registration No. 2979459 for the mark YOSEMITE for "cigarettes"; and Registration No. 2721476 for the mark YOSEMITE TECHNOLOGIES for "computer software for archiving and restoring computer files"). The test for geographic descriptiveness is not just whether the geographic term is the name of a known place, but includes whether

---

Section 7(b) of the Trademark Act. See, e.g., In re Hunter Publishing Company, 204 USPQ 957, 963 (TTAB 1979) (cancellation "destroys the Section [7(b)] presumptions and makes the question of registrability 'a new ball game' which must be predicated on current thought.").

purchasers will make a goods/place association.  See In re

Nantucket, supra.  Because the records of those third-party

registrations are not before us, we cannot determine the basis on

which those marks were registered.  Also, several of the

registrations were not issued to California entities (for

example, Registration No. 2649887 for the mark YOSEMITE ANIMAL

COOKIES for "cookies," issued to a company located in Illinois),

suggesting that the goods did not originate in California and

that a refusal on the basis of geographical descriptiveness may

not have been warranted.[9]

In any event, regardless of what these third-party

registrations, or the records in the registrations, may show, and

even to the extent the marks in these third-party registrations

"have some characteristics similar to [applicant's application],

the PTO's allowance of such prior registrations does not bind the

Board or this court."  In re Nett Designs Inc., 236 F.3d 1339, 57

USPQ2d 1564, 1566 (Fed. Cir. 2001).  It is well settled that each

case must be decided on its own facts, based on the particular

mark, the particular goods or services, and the particular record

in each application.  See Nett Designs Inc., supra; and In re

---

[9] Applicant's arguments regarding "discriminatory and arbitrary
application of 2(e)(2) and 2(e)(3)" (Brief, p. 15) are not understood.
The purpose of each section is different and the corresponding tests
for registrability are different.  In particular, a higher standard is
required to show that a term is geographically deceptively
misdescriptive.  See In re California Innovations, 329 F.3d 1334, 66
USPQ2d 1853 (Fed. Cir. 2003); and In re Beaverton Foods Inc., 84 USPQ2d
1253 (TTAB 2007).

Scholastic Testing Services, Inc., 196 USPQ 517 (TTAB 1977). See also In re First Draft, Inc., 76 USPQ2d 1183, 1188 (TTAB 2005) ("even proof that various examining attorneys have registered a particular type of mark in the past does not establish that there is an Office practice holding such marks are generally registrable.").

We find that the primary significance of the term "Yosemite" is geographic, and also that the primary significance of YOSEMITE BEER, in its entirety, is geographic. The addition of a generic word to a geographical term does not overcome the primary geographic significance of the mark as a whole. See In re Brouwerij Nacional Balashi NV, supra at 1821; In re JT Tobacconists, supra at 1082; and In re Cambridge Digital Systems, supra. The word BEER is generic for goods identified as "alcoholic beer" and the combination of that word with YOSEMITE does nothing to alter the geographic significance of YOSEMITE alone.

## Goods/Place Association and Origin of the Goods

Where the geographical significance of a term is its primary significance and where the geographical place is neither obscure nor remote, a public association of the goods with the place may ordinarily be presumed from the fact that the applicant's own goods come from the geographical place named in the mark. See In

14

re Carolina Apparel, 48 USPQ2d 1542 (TTAB 1998); and In re California Pizza Kitchen Inc., 10 USPQ2d 1704 (TTAB 1988).

Early in the prosecution of its application, applicant took the position that Merced, "where the beer is brewed, is physically and historically linked to and associated with the nearby Yosemite National Park."  (Response, April 3, 2006.)  In addition, applicant submitted geographical information about Merced along with various promotional materials of the city to support this association, that is, "to confirm [Merced's] relationship and proximity to Yosemite National Park." (Response, March 10, 2006).  Applicant's evidence and arguments in this regard are quite persuasive.  The city's promotional materials include a Greater Merced Chamber of Commerce brochure, a city map and letterhead, and a Lodging Guide and Destination Guide from the Merced Conference & Visitors Bureau, all of which tout the city of Merced as the "Gateway to Yosemite" and the close proximity of Merced to Yosemite.  The Chamber of Commerce brochure, in particular, states that Merced "has claimed the title 'Gateway to Yosemite' for more than a century."  Under the heading GATEWAY TO YOSEMITE, the brochure goes on to state:

> Yosemite National Park attracted almost four million visitors into their gate last year.  Since Highway 140 is the only highway not closed by most winter snowstorms, the most scenic route is also the most reliable. ... Merced has been Central California's favorite way station since the first stage coaches

15

and railroad trains wound their way from downtown
Merced to Yosemite Valley. ...

The proximity of Merced to the park is also acknowledged in The Columbia Encyclopedia (2004), indicating in the description of "Merced" that "Yosemite National Park is nearby."[10] Merced is further described in this entry as "a center for tourism," and it is clear that the primary tourist attraction is the park. It appears from the maps and other information of record that the area surrounding Merced and the park is largely rural, and that Highway 140, which leads out of Merced, is one of the few roadways providing direct access to the park, and possibly the only access at certain times of the year. As stated in Merced's Chamber of Commerce brochure, it is "the only highway not closed by most winter snowstorms."

Applicant pointed to additional evidence reflecting Merced's connection to Yosemite, noting that the Merced River originates in Yosemite National Park and flows into the city of Merced; that Lake Yosemite is located in Merced; that the Merced Conference and Visitor Bureau has a website address of yosemite-gateway.org; and that "Yosemite" appears in street names in the city such as the "Yosemite Parkway." In addition, a transit system known as the Yosemite Area Regional Transportation System (YARTS) "begins

---

[10] From the website credoreference.com. We take judicial notice of this reference.

in Merced" and provides a shuttle service between Merced and Yosemite National Park.  (Response, March 10, 2006.)

In its subsequent responses and in its brief, applicant does not again mention the relationship between Merced and Yosemite. At the same time, however, applicant does not deny that the relationship exists, and indeed, in view of the evidence, applicant would be hard pressed to do so.  Yet applicant now takes the position that its mark YOSEMITE BEER is arbitrary as used in connection with beer.  Applicant argues that its beer does not originate in Yosemite National Park, but instead is brewed on-site at applicant's brewpub which is located in Merced, California, approximately 80 miles away from Yosemite National Park.  Applicant has submitted Columbia Gazetteer entries for "Merced" and "Yosemite National Park"; and maps and other printouts from the website, mapquest.com, showing the relative locations of these areas and the driving distances between them. Applicant further argues that there is no connection between beer and Yosemite National Park, stating, in particular, that the city of Merced does not bring in or use water that comes from the park but instead uses water from its own underground wells.

It is clear that the city of Merced, where applicant's beer is produced, is not literally within the boundaries of Yosemite National Park.  Nevertheless, Yosemite has a significant relationship to the source of applicant's goods.  Applicant's

17

business is located in a city whose economy, and largely its identity, center around its association with Yosemite National Park, an association that the city has fostered and promoted for more than a century. Applicant is obviously using the term YOSEMITE in its mark, not in any arbitrary sense as applicant claims, but rather to reflect its association with the geographic place.

Thus, we find that the goods come from Yosemite, the place named in the mark, or at a minimum, that the goods originate in an area which applicant admits and the evidence shows is located near Yosemite. Since the goods originate at or near the place named in the mark, we can presume an association of applicant's beer with the park. See, e.g., In re Joint-Stock Company "Baik" 80 USPQ2d 1305, 1310 (TTAB 2006) ("we presume a goods/place association [of vodka with BAIKALSKAYA meaning "from Baikal"] because applicant is located near Lake Baikal, in the city of Irkutsk"). See also, e.g., Warwood v. Hubbard, 228 USPQ 702, 702 (Mont. 1985) (YELLOWSTONE OUTFITTERS primarily geographically descriptive of outfitting services offered "near Yellowstone Park").

The consumers for applicant's beer, including the residents of and visitors to Merced, would reasonably believe that the beer came from or near Yosemite and that there was some association or connection of the beer with Yosemite. Applicant argues that "it

18

should not be penalized for its relative proximity to the Yosemite National Park." (Brief, p. 9.) However, the purpose of Section 2(e)(2) of the Act is not to punish a particular business for using a geographic name, but rather to leave geographic names free for all businesses operating in the same area to inform customers where their goods or services originate. See In re MCO Properties Inc., 38 USPQ2d 1154, 1156 (TTAB 1995). There is no question that "Yosemite" is a term that applicant's competitors in Merced are entitled to use to describe the geographic origin of their beer.

Under the circumstances, nothing more need be shown by the examining attorney in order to establish a goods/place association. See In re Opryland USA Inc., supra at 1413 (TTAB 1986) ("[I]n that the evidence shows a substantial part of appellant's commercial activities emanate from or are related to Nashville, Tennessee, and that city is not obscure or remote, it is unnecessary for the Examining Attorney to establish by other evidence that a services/place relationship exists between appellant's services and the city of that name."). Even if, as applicant claims, the label on applicant's beer were to state that YOSEMITE BEER is produced in "Merced," the relationship of that city with Yosemite will cause the public to make a goods/place association of the beer with Yosemite. It would not

19

be unreasonable for consumers to even assume, correctly or incorrectly, that applicant's beer is made from water drawn from the "clear streams"[11] in the park, or perhaps from the river that flows from Yosemite into Merced.

In further connection with its assertion that YOSEMITE BEER is an arbitrary term, applicant argues that no commercial activity is performed in Yosemite National Park and thus, according to applicant, there can be no reasonable or likely goods/place association on the part of consumers. Applicant contends (without support) that Yosemite National Park does not produce any commercial goods or services of any kind, and further that "National Parks in general do not produce beer, nor are national parks known for beer or brewpubs." (Brief, p. 9.) Applicant maintains that "The sole commercial enterprises are licensed vendors who provide services to Park visitors (such as lodging and souvenirs)." (Id., at 13.)

In an attempt to support this argument, applicant has submitted nearly two hundred third-party registrations for marks that include the names of other National Parks (e.g., "Yellowstone" and "Rocky Mountain"), the names of rivers (e.g., "Snake River"), and the names of mountain ranges (e.g., "Adirondack" and "Sierra Nevada"), along with Columbia Gazetteer entries and/or website printouts with information about all or

---

[11] wikipedia.org, supra.

most of these other geographic areas.  Applicant concludes, based on these registrations, that it is common for the United States Patent & Trademark Office ("USPTO") to permit the registration of goods and services which use the names of National Parks and other "rural areas" which applicant claims are "devoid of commercial activity" and that the USPTO has "consistently found in permitting such marks to register that the public is not confused or deceived."  (Request for Reconsideration, June 16, 2006.)

We point out that the issue under Section 2(e)(2) is not whether consumers will be "confused or deceived," but rather, as noted earlier, whether applicant has a right to exclude others from using the term to describe the geographic origin of their goods or services.  Moreover, apart from the fact that applicant's generalizations about National Parks and the other types of places named in the third-party registrations are entirely unfounded,[12] these registrations are irrelevant to the question of whether commercial activity takes place in Yosemite,

---

[12] It is well settled that a geographic term "can indicate any geographic location on earth" (McCarthy on Trademarks and Unfair Competition § 14:3 (4th ed. 2007)) including rivers, mountain ranges and National Parks.  Indeed, at least one court has held that "Yellowstone," the place named in one of the registrations relied on by applicant, is geographically descriptive.  See Warwood v. Hubbard, supra (YELLOWSTONE OUTFITTERS primarily geographically descriptive of outfitting services offered in the region around Yellowstone National Park).

or, for that matter, to any question concerning the registrability of applicant's mark.

In addition, the evidence submitted by the examining attorney shows that the park is clearly not devoid of commercial activity, and applicant itself admits that there are licensed vendors in the park. As stated on the website, yosemitepark.com, the Yosemite area offers not only "expansive wilderness" but also

> the guest services and amenities you would find at a year-round resort. ... including lodging, food and beverage, retail operations, transportation, tours and recreation services. ...

It would certainly not be unreasonable for consumers to expect that the restaurants in the park, just as any "resort" facility, would also sell beer. This is not a situation where it is so unlikely that certain goods could come from a particular geographic place, for example, NORTH POLE for bananas, that no goods/place association could be drawn. Here, the evidence shows that both goods are offered and services are rendered in Yosemite National Park, and that the city where applicant is located actively fosters a connection between the city and Yosemite, such that for purposes of our analysis consumers would regard them as part of the same geographic area. In establishing a goods/place association between beer and Yosemite, the examining attorney need not show that the public would actually make the asserted association, i.e., that the public actually believes the beer is

made in Yosemite National Park.  See In re Nantucket Allserve Inc., 28 USPQ2d 1144, 1146  (TTAB 1993) ("even assuming for the sake of argument that the public does not believe that NANTUCKET NECTARS soft drinks are actually manufactured on Nantucket (and of course they are not), nevertheless, these goods originate from a company" that has a significant connection to Nantucket). Rather the examining attorney need only show, as she has done here, a "reasonable basis" for concluding that the public would make the goods/place association.  In re Loew's Theatres, Inc., supra at 868.  The facts that there are restaurants serving beverages in Yosemite and that applicant is located in or nearby the Yosemite region and promotes an association with Yosemite, establish a goods/place association of beer with Yosemite. Consumers would likely believe that applicant's beer had its origin in or was in some way connected to Yosemite.

**Decision:**  The refusal to register under Section 2(e)(2) is affirmed.